Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS in part and MODIFIES in part the Opinion and Award of the deputy commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the deputy commissioner as
STIPULATIONS
1. On 28 July 1991, the date of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time the employee-employer relationship existed between plaintiff and defendant employer.
3. At such time the carrier on the risk was the Amerisure Companies.
4. At such time plaintiff's average weekly wage as determined by Industrial Commission Form 22 was $320.82.
5. On 15 September 1992, plaintiff was terminated from employment with defendant employer. At the time of her termination, there was work available for plaintiff and plaintiff was willing to do that work. Further, the question of whether plaintiff was able to do that work is one which would have to be resolved by the medical evidence which the parties will offer subsequent to the hearing in this matter.
* * * * * * * * * * * * *
The Full Commission adopts in part and modifies in part the findings of fact of the deputy commissioner and finds as follows:
FINDINGS OF FACT
1. On 28 July 1991 plaintiff was 32 years of age and had been employed as an instrument technician for defendant employer, a hospital, since approximately July of 1987. Plaintiff worked in the decontamination area on the third shift which began at approximately 10:45 p.m. Plaintiff's duties consisted of processing medical instruments for surgery and other departments, and included decontamination of dirty instruments and gas and steam sterilization of the instruments.
2. Gas sterilization of instruments was done in the sterilization room with a gas autoclave which used ethylene oxide gas. The procedure plaintiff would follow would be to place a cart with racks of instruments into the autoclave, push a button to automatically lock the door, and push another button to begin the sterilization process which could take up to five and one-half hours. Plaintiff would then remove the cart of instruments from the autoclave and place the instruments into an aerator. During this last process plaintiff would cover her face to avoid smelling ethylene oxide gas. After eight to sixteen hours plaintiff would remove the instruments from the aerator.
3. The gas autoclave is equipped with an alarm which sounds if there is a gas leak from the autoclave, and a pressure gauge which monitors the pressure of the ethylene oxide gas while the autoclave is in use.
4. There was often a slight odor of ethylene oxide gas in the sterilization room.
5. Employees in the decontamination area participated in periodic air quality surveys by wearing badges during their work shifts which were later "read" for ethylene oxide exposure. Plaintiff participated in seven of these surveys from approximately September of 1987 to approximately February of 1992. On these occasions, plaintiff's survey results revealed exposure so low as to constitute "no exposure".
6. On the afternoon of 28 July 1991 pursuant to a special service call, the gas autoclave was tested and inspected by Max Kenmore who was a service technician with MDT Biologic Company, and who had serviced the gas autoclave since 1986. Mr. Kenmore was told that an alarm in the autoclave had sounded. On that occasion the gas autoclave was functioning properly, including the alarm and the pressure gauge. A leak in the "load side" door, which was too insignificant to be harmful, was fixed by replacing a gasket.
7. On 28 July 1991 following the servicing of the gas autoclave earlier that afternoon by Mr. Kennemore, plaintiff was working in the sterilization room but did not remember whether she was operating the gas autoclave. At around midnight, plaintiff complained to Rosemary Steele, the senior technician and plaintiff's supervisor on that shift, about smelling gas fumes and becoming nauseous and dizzy. Ms. Steele went into the sterilization room but did not smell any odor beyond the slight odor which is often present in the sterilization room. During that time, neither the alarm on the autoclave sounded nor did the pressure gauge register a loss of pressure in the autoclave. Plaintiff was permitted by Ms. Steele to take a longer lunch break than usual that night due to plaintiff's complaints of nausea and dizziness.
8. Plaintiff was scheduled off of work the day following 28 July 1991 and missed work the day after her scheduled day off due to nausea, dizziness and throat irritation.
9. Since 28 July 1991 plaintiff has had symptoms of nausea, dizziness, eye, nose, and throat irritation, skin irritation on the anterior side of her wrists, dry cough, weakness, tightness in her right upper chest, nose bleeds, hoarseness, drowsiness, altered sense of taste, labored breathing upon exertion, and depression. She has been seen at Presbyterian Hospital's Employee Health Department, Presbyterian Hospital's Emergency Room, and Presbyterian Hospital's Employee Assistance Program, and has been treated by Drs. Tracy, Tucker, Beard, Dawkins and Kamerer, and Mr. Smith at Nalle Clinic. She has also been treated by Dr. Dennis, an ear, nose and throat specialist, Dr. Hutchinson, an allergist, Dr. Haponik, a pulmonary specialist and by Drs. Dyck, O'Rourke and Porowski at Holly Hill Hospital.
10. Since 28 July 1991 plaintiff has been diagnosed as having acute laryngitis, acute bronchitis, allergic rhinitis, anterior ethmoid sinusitis, bilateral maxillary sinusitis, depression and generalized anxiety disorder with agoraphobic features for which she has received conservative treatment.
11. Plaintiff has failed to establish by the greater weight of the evidence that on 28 July 1991 she experienced an interruption of her normal work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences resulting in an injury to plaintiff.
12. Plaintiff has failed to establish by the greater weight of the medical evidence that the medical condition(s) and psychological condition(s) with which plaintiff has been diagnosed since 28 July 1991 are causally related to an exposure to ethylene oxide gas.
13. Plaintiff has failed to establish by the greater weight of the evidence that she contracted an occupational disease due to causes and conditions characteristic and peculiar to her employment or that her employment placed her at a greater risk than the general public of contracting an occupational disease.
* * * * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 28 July 1991, plaintiff did not sustain an injury by accident arising out of and in the course of her employment with defendant employer. G.S. § 97-2(6).
2. Plaintiff has not contracted or developed a disease or condition which is proven to be due to causes and conditions characteristic of and peculiar to her employment with defendant employer, excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment and therefore, does not have an occupational disease within the meaning of G.S. § 97-53(13).
3. Plaintiff's claim, therefore, is not compensable under the provisions of the North Carolina Workers' Compensation Act. G.S. § 97-2(6); G.S. § 97-52; G.S. § 97-53(13).
* * * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Under the law, plaintiff's claim must be, and the same is, DENIED.
2. Each side shall pay its own costs.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ __________________ DIANNE C. SELLERS COMMISSIONER
S/ __________________ J. RANDOLPH WARD COMMISSIONER
BSB:be